## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | | |
|---|---|---|
| FRANK JAMES HARRIS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 1:17-CV-082 (LAG) |
| | : | |
| KEVIN SPROUL, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## <u>ORDER</u>

Before the Court is Defendant Kevin Sproul's Motion for Summary Judgment (Motion) (Doc. 8). For the reasons stated below, the Motion is **GRANTED in part and DENIED in part**.[1]

## PROCEDURAL BACKGROUND

Plaintiff Frank James Harris filed this case against his former employer Kevin Sproul, the Sheriff of Dougherty County, Georgia. (Doc. 3-1.) In his Complaint, Plaintiff (who is African-American) states that he worked as a deputy with the Dougherty County Sheriff's Office from July 2000 until his termination in January 2016. (*Id.* ¶¶ 1, 5, 7.) He was fired for posting political views on Facebook that allegedly violated his employer's policies. (*Id.* ¶¶ 9, 12.) By contrast, white colleagues who expressed similar political views on Facebook were allegedly not disciplined by Defendant. (*Id.* ¶ 13.)

Plaintiff sues Defendant Sproul in his official and individual capacities. (*Id.* at 1.) His Complaint asserts violations of the U.S. Constitution's First Amendment protection of

---

[1]       Also before the Court is Plaintiff Frank James Harris's Cross Motion for Summary Judgment and for a Permanent Injunction Restoring Him to His Position (Cross Motion) (Doc. 14). This was filed on July 16, 2018—twenty-one days after the Court's dispositive motion deadline of June 25, 2018. (*Id.*; Doc. 7 at 1.) Plaintiff neither sought an extension to file this Cross Motion after the Court's deadline nor offered any explanation for the delay. (*See* Docket.) "A district court retains 'broad discretion in deciding . . . whether to consider untimely motions for summary judgment.'" *McClaney v. Macon Cty. Bd. of Educ.*, 2011 WL 9015, at *2 (M.D. Ala. Jan. 3, 2011) (quoting *Enwonwu v. Fulton–Dekalb Hosp. Auth.*, 286 F. App'x 586, 595 (11th Cir. 2008)). As Plaintiff failed to show good cause why the Court's dispositive motion deadline should be extended, the Court declines to consider the Cross Motion (Doc. 14) and **DISMISSES** it as untimely.

freedom of speech and the Fourteenth Amendment's Equal Protection Clause (both brought via 42 U.S.C. § 1983). (*Id.* ¶¶ 16–17.) Plaintiff also alleges violations of the parallel provisions of the Georgia State Constitution, namely Art. I, § 1, paragraphs 1 and 5 (both brought via Ga. Code Ann. §§ 51-1-8 and 51-1-9).[2] (*Id.* ¶¶ 18–19.) As remedy, he seeks compensatory and punitive damages, attorney's fees and costs, and the restoration of his employment. (*Id.* ¶¶ 20–21.)

Plaintiff filed this case on March 30, 2017 in the Superior Court of Dougherty County, Georgia. (Doc. 3-1 at 1.) Defendant removed the case to this Court on April 28, 2017 and amended his removal filings on August 2, 2017. (*See* Docket.) He then filed the instant Motion on June 25, 2018. (Doc. 8.) Plaintiff and Defendant timely filed their respective response and reply. (Docs. 12–13, 17.) The Motion is therefore ripe for review. M.D. Ga. L.R. 7.3.1(A).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends that no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc)).

"An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing

---

[2]     Plaintiff's Complaint lists Art. 1, § 1, ¶ 1 as the Georgia constitutional provision guaranteeing equal protection under the law. The correct provision is Art. 1, § 1, ¶ 2.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Allen*, 121 F.3d at 646. The Court shall, however, "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323; *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322–24; *Barreto*, 331 F. App'x at 673. Local Rule 56 further requires that "documents and other record materials relied upon by [the moving party] be clearly identified for the court." M.D. Ga. L.R. 56. "Material facts not supported by specific citation to particular parts of materials in the record and statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the court." *Id.*

"When that burden has been met, the burden shifts to the nonmovant . . . to go beyond the pleadings and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 556–57 (11th Cir. 2014) (citations omitted). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see also Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

## FACTS[3]

At the end of 2015, Plaintiff Frank Harris was working as a deputy with the Dougherty County Sheriff's Office (DCSO). (Doc. 3-1 ¶¶ 1, 5; Doc. 3-3 ¶ 5; Doc. 12-2 at 2.) He had been employed by the agency for the past fifteen years. (Doc. 3-1 ¶¶ 1, 5; Doc. 3-3 ¶ 5.)

Around December 29, 2015, during the midst of the 2016 presidential campaign season, Plaintiff was off-duty and made the following Facebook post on his phone:

Hello!!! Good citizens. I would like to share something with you this day. A while back, I was conversing with some of my white brothers that claimed to be christians(?) we was talking about race prejudices, religion,politics and many other things. Now! There are many who might be upset with the president for allowing refugees in our country. H***! I say to these people. "Stop being afraid" they say: let the past be the past. We all know that everything the white man got, he stole!!! They say we should forgive and forget. I say! H*** Nall! Their ancestors has brought sham to their off spring by kidnapping, tape, murder and amung other unconstitutional things against human dignity. The young white generation need to understand one of many things, "Their ancestors has never been kidnapped, rape, murder or taken from their original state of being. They want to talk against moosilums and any other religious groups that they feel is unjust. Their ancestors has more blood on their hands than any other religion. Don't get me wrong. I am not up for any mistreatmen of any human life. Let me ask you something young white America. How many of you, your friends or family had somebody fight in the civil war for the south? How do you feel about being descendants of such a people that bought human being and deprived them of their human rights."but" at the same time yal want to condem anybody who threaten your Wat of life."D***" young white people, since yal want it to be the past. This is what I would like to see. I want to see one million white people, March their forgiving as see up to the white house and tell their government to give the ancestors of past slaves "reparation"and then my people won't be so adgile. You see young white America, it's not yal fault. B*******!!!! Y'all educated. Y'all know...... So now what! And for those of you who may feel

---

[3]     The relevant facts are derived from the Complaint (Doc. 3-1), Defendant's Answer to the Complaint (Doc. 3-3), Defendant's Statement of Material Facts (Doc. 8-2), Plaintiff's Response to Defendant's Statement of Material Facts (Doc. 13-2), and the record in this case. Where relevant, the factual summary also contains material facts derived from the pleadings, the discovery and disclosure materials in the docket, and any affidavits, all of which are construed in the light most favorable to Plaintiff as the nonmoving party. *See* Fed. R. Civ. P. 56; *Celotex Corp.*, 477 U.S. at 323.

> that this is some form of hate. "KMA" I see how y'all study is. Don't just tolerate me.understand……luv your neighbor.

(unedited, except for abbreviated profanity). (Doc. 8-4; Doc. 11 at 40–42; Doc. 12-3 at 19; Doc. 14-3 at 2.) Plaintiff's Facebook profile noted that he was employed by DCSO. (Doc. 11 at 29.)

Shortly after Plaintiff posted his message, several DCSO deputies with whom he was Facebook friends reported it up the chain of command and expressed their disapproval of the post. (Doc. 8-5.) It is unclear whether Plaintiff learned of their reactions, but he deleted the Facebook post within two days of making it. (Doc. 8-6 at 1; Doc. 11 at 65.) By December 31, 2015, Plaintiff's direct supervisors were made aware of Plaintiff's post. (Doc. 8-6 at 1.) One of them filed a disciplinary report describing it as containing "highly inflammatory and racist's [sic] remarks against white Americans." (*Id.*) Moreover, "Dep. Harris should have known that racist's [sic] remarks against one section of Americans cannot be tolerated while employed for the Dougherty County Sheriff's Office." (*Id.*) The post, said the supervisor, was "a direct violation of Sheriff's Office SOP [Standard Operating Policy] 1.21 Computer Use and Security under the paragraph Social Media." (*Id.*) That policy forbids employees from using social media in a way that tarnishes the agency's reputation or detracts from the agency's mission—even while they are off-duty. (Doc. 8-3 at 2.) Plaintiff's post, continued the supervisor, had "brought discredit" to Plaintiff and the agency and was detrimental to the agency's "Good Working Order." (Doc. 8-6 at 1.) He concluded by recommending Plaintiff for termination. (*Id.*)

When Plaintiff returned to work, he was called to a meeting with his supervisors and asked about the post. (Doc. 11 at 40.) Plaintiff objected to his proposed termination and, a few days later, asked for a termination review hearing. (Doc. 8-6 at 1.) At the hearing on January 14, 2016, the panel of officers agreed with the supervisor's termination recommendation. (Doc. 8-7.) The next day, Defendant accepted their recommendation and fired Plaintiff. (*Id.*; Doc. 3-1 at 7.) Defendant later testified that the Facebook post was the only basis for Plaintiff's termination. (Doc. 12-3 at 18–19.)

As Plaintiff and his attorney were preparing to file this case, they discovered a series of posts appearing on the Facebook profiles of two white DCSO deputies, Michael Kerce

and Mark Farley. (Doc. 11 at 38, 74–75; *see also* Doc. 8-8 at 2.) The posts consisted of vulgar, sexist, and racially-charged images mocking—among other matters—Hillary Clinton, then-president Barack Obama, transgender personality Caitlyn Bruce Jenner, and slavery. (Doc. 8-9 at 1–5, 7–8.) Kerce's Facebook page, in particular, contained several arguably racially-offensive and politically-charged posts, as well as ones which could be read as insulting women and LGBTQ individuals. (Doc. 12-7 at 14–23.) There is a question as to whether the two deputies actively liked, shared, or posted these images. (Doc. 12-11 at 1–23.) In addition, Farley's Facebook profile picture depicted an eagle carrying both the U.S. and Confederate flags. (Doc. 8-9 at 6.) Farley also left a Facebook comment in support of police officers who were fired for their ties to the Ku Klux Klan. (Doc. 8-9 at 8–9.)

Before filing suit, Plaintiff's attorney notified Defendant of the two deputies' Facebook activity. (Doc. 8-8 at 2.) Defendant then ordered an investigation. (Doc. 12-3 at 52.) Both deputies were questioned about some of the photos, and one deputy was asked to delete an image "out of respect" for DCSO. (Doc. 12-6 at 12–13, 37; Doc. 12-8 at 28–29, 47.) After the investigation, neither of the deputies was terminated, and, at the time this suit was filed, both remained DCSO employees. (Doc. 12-3 at 45.)

## DISCUSSION

Plaintiff's Complaint alleges that Defendant—by terminating Plaintiff for his Facebook post—violated the First Amendment, the Fourteenth Amendment's Equal Protection Clause, and the parallel provisions of the Georgia State Constitution. He sues Defendant in his official and individual capacities, for both money damages and injunctive relief.[4]

## I.   Immunity as to Federal Claims

### A. Official Capacity

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Social Servs.*, 436 U.S. 658,

---

[4]   Plaintiff's Complaint generally alleges that this action is against Defendant in his official and individual capacities, for both injunctive relief and damages, on federal and state grounds. (Doc. 1.) It is unclear from his briefing, however, whether he seeks both types of relief for each ground against Defendant in each capacity. The Court has construed his Complaint to read that he is, and it conducts each type of analysis below.

690 n.55 (1978). The real party in interest in these suits is the state. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). As such, the Eleventh Amendment typically "provides sovereign immunity that prevents a state, a state agency, or a state employee acting in an official capacity from being sued in federal court without consent." *Williams v. Monroe Cty. Dist. Attorney*, 702 F. App'x 812, 813 (11th Cir. 2017) (citing *Melton v. Abston*, 841 F.3d 1207, 1233 (11th Cir. 2016)). If a state (or an "arm of the state") removes a suit to federal court, however, it waives its Eleventh Amendment immunity to suit in a federal forum because it voluntarily invokes a federal court's jurisdiction. *See Stroud v. McIntosh*, 722 F.3d 1294, 1297, 1301–02 (11th Cir. 2013); *see also Pellitteri v. Prine*, 776 F.3d 777, 779 (11th Cir. 2015) (holding that a sheriff acts as an "arm of the state" when exercising his power to hire and fire his deputies).

A state might still retain some other form of immunity from liability, though. *Stroud*, 722 F.3d at 1302–03. In particular, removal does not waive defenses a state would have enjoyed in state court, "including immunity from liability for particular claims." *Id.* at 1302. Thus, the proper inquiry is "whether some form of immunity would bar [Plaintiff's] Complaint if the case had never been removed—if a state court, instead of a federal court, were deciding the motion . . . on immunity grounds." *Page v. Hicks*, 2018 WL 828770, at *5 (N.D. Ala. Feb. 12, 2018).

### 1. Damages Claims

In response to Plaintiff's federal damages claims against Defendant in his official capacity, Defendant asserts the defense of state sovereign immunity. (Doc. 8-1 at 14.) "In Georgia, sovereign immunity extends to the state and all of its departments and agencies," including sheriffs. *Carter v. Butts Cty.*, 821 F.3d 1310, 1323 (11th Cir. 2016) (internal quotation marks omitted) (citing Ga. Const. art. I § 2, ¶ IX and *Gilbert v. Richardson,* 452 S.E.2d 476, 479 (Ga. 1994)). It protects these government entities against all unconsented-to legal actions. *Everson v. DeKalb Cty. Sch. Dist.*, 811 S.E.2d 9, 11 (Ga. Ct. App. 2018). "Consent to suit can only be given by the [Georgia] Constitution . . . or by an act of the General Assembly." *Lathrop v. Deal.*, 801 S.E.2d 867, 880 (Ga. 2017). Where no consent is given, a suit against the State is barred. *Id.*

The State has waived its sovereign immunity in very limited circumstances—primarily, in suits under the Georgia Tort Claims Act, against municipalities that have purchased general liability insurance, and for breach of a written contract. *See id.* at 877; *see also Carter*, 821 F.3d at 1323. "The burden of demonstrating a waiver of sovereign immunity falls on the party seeking to benefit from it." *Carter*, 821 F.3d at 1324. Here, Plaintiff has not shown—or even argued—that the State has consented to suit and waived its sovereign immunity. None of the circumstances listed above applies in this case, nor can the Court otherwise find evidence of waiver. Accordingly, Plaintiff's federal damages claims against Defendant in his official capacity are barred by sovereign immunity.

## 2. Injunctive Relief Claims

The *Ex parte Young* doctrine provides another exception to Eleventh Amendment immunity by authorizing "official-capacity suits against state officials . . . when the plaintiff seeks '*prospective* equitable relief to end *continuing* violations of federal law.'" *Lane v. Central Ala. Comm. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) (emphases in original) (citation omitted); *see also Ex parte Young*, 209 U.S. 123 (1908). "[R]equests for reinstatement constitute prospective injunctive relief that fall within the scope of the *Ex parte Young* exception and, thus, are not barred by the Eleventh Amendment." *Id.*

## B. Individual Capacity

### 1. Damages Claims

Defendant asserts qualified immunity in response to Plaintiff's federal claims against him in his individual capacity. (Doc. 8-1 at 11–14.) "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). First, the Court must determine whether an official was "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Lewis v. City of W. Palm Beach*, 561 F.3d

1288, 1291 (11th Cir. 2009). A plaintiff meets this burden by showing (1) that the official's conduct amounted to a constitutional violation and (2) that "the right violated was 'clearly established' at the time of the violation." *Id.*

A government employee acts in his discretionary authority when "(a) performing a legitimate job-related function . . . (b) through means that were within his power to utilize." *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). In Georgia, "[s]heriffs alone hire and fire their deputies." *Manders v. Lee*, 338 F.3d 1304, 1311 (11th Cir. 2003) (citing Ga. Code Ann. § 15-16-23). The Parties do not dispute that Defendant was acting in his discretionary authority as Sheriff of Dougherty County when he terminated Plaintiff's employment as a deputy. Because, as discussed below, Plaintiff has made a *prima facie* case that Defendant violated a constitutional right—specifically, Plaintiff's right under the Equal Protection Clause to be free from racial discrimination—the next question is whether Plaintiff has shown that this right was clearly established.

"A right is clearly established when it was earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that the defendant was violating federal law." *Potter v. Williford*, 712 F. App'x 953, 954 (11th Cir. 2017) (citations omitted). In this circuit, clearly established law means decisions of the U.S. Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state in effect at the time of the alleged violation. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007). The state of the law at the time of the alleged violation must give officials "fair warning" that their acts were unconstitutional. *Holmes v. Kucynda*, 321 F.3d 1069, 1078 (11th Cir. 2003) (quoting *Hope*, 536 U.S. at 740). "The Equal Protection Clause right to be free from race discrimination in public employment is clearly established." *Potter*, 712 F. App'x at 954 (citing *Smith v. Lomax*, 45 F.3d 402, 407 (11th Cir. 1995)). Defendant argues that, despite this, his termination of Plaintiff was not so egregious that he would have had fair warning that it violated the Equal Protection Clause. (Doc. 8-1 at 13–14.) The question is not one of degrees, but whether the right to equal protection under the Fourteenth Amendment was firmly established such that a reasonable person in Defendant's position would have known that the alleged unequal treatment on the basis of race would

violate federal law. The right to be free from race discrimination is so clearly established that Defendant had fair warning of the unlawfulness of his action, and he has thus failed to establish his entitlement to qualified immunity on this claim.

### 2. Injunctive Relief Claims

It is not clear from the briefing whether Defendant asserts qualified immunity against Plaintiff's injunctive relief claims against him in his individual capacity. To the extent he does, that defense fails. "Because qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief." *Ratliff v. DeKalb Cty.*, 62 F.3d 338, 340 n.4 (11th Cir. 1995).

## II.   First Amendment Claims

Plaintiff's Complaint alleges that Defendant's termination of him for his Facebook post violated his First Amendment right to freedom of speech. (Doc. 3-1 ¶¶ 12, 16.) As a general rule, "[a] government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015) (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)). When a citizen enters public service, he does not completely give up "the First Amendment rights [he] would otherwise enjoy . . . to comment on matters of public interest." *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). But his government employment does limit those rights. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* Law enforcement agencies, in particular, have unique First Amendment concerns because they are "paramilitary organization[s], with a need to secure discipline, mutual respect, trust and particular efficiency among the ranks" and because "[o]rder and morale are critical to successful police work." *Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994). They also have "a particular interest in maintaining 'a favorable reputation with the public.'" *Duke v. Hamil*, 997 F. Supp. 2d 1291, 1301 (N.D. Ga. 2014) (quoting *Busby v. City of Orlando*, 931 F.2d 764, 775 (11th Cir. 1991)).

To assess the competing First Amendment interests of a government employee and his employer, the Court must apply the four-part analysis established in *Pickering*. *Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005). For an employee to prevail, he must show that: (1) he spoke as a private citizen on a matter of public concern; (2) his free speech interests outweighed the government's interest in efficient public service; and (3) his speech was a substantial factor in his termination. *Id.* If he demonstrates all three elements, then the burden shifts to the government to show that (4) it would have terminated him even absent his protected speech. *Id.*; *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015). The first two elements are questions of law, dictating whether Plaintiff's speech is protected by the First Amendment; the second two elements are fact questions for a jury, unless the evidence is undisputed. *Moss*, 782 F.3d at 618.

In this case, the first, third, and fourth elements are undisputed. Defendant does not dispute that Plaintiff's speech about America's historical and present racial divides implicates matters of public concern and was made in his private capacity. Furthermore, Defendant testified that he terminated Plaintiff's employment because of his Facebook post and that he had no other reason to fire Plaintiff. (Doc. 12-3 at 15–16, 18–19.) Thus, the only question is whether the government's "interests in regulating Plaintiff's speech to promote the efficiency of the Sheriff's Office's services that it performs through its deputies outweigh[ ] Plaintiff's First Amendment interests." (Doc. 8-1 at 6, 8.)

In weighing Plaintiff's and Defendant's interests, the Court should consider "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made." *Martinez v. City of Opa-Locka*, 971 F.2d 708, 712 (11th Cir. 1992) (emphasis and citation omitted). The Court may also look to whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (citing *Pickering*, 391 U.S. at

570–73). Here, taking the facts in the light most favorable to Plaintiff, the balancing favors Defendant.

First, the Court considers whether the speech at issue impeded the government's ability to perform its duties efficiently. A "government's legitimate interest in avoiding disruption does not require proof of actual disruption. Reasonable possibility of adverse harm is all that is required." *Moss*, 782 F.3d 613, 622 (citing *Anderson v. Burke Cty.*, 239 F.3d 1216, 1220–21 (11th Cir. 2001)). Here, there is evidence of both actual and possible disruption. The record reveals that several DCSO officers reported Plaintiff's post to their superiors and expressed their discomfort with it.[5] (Doc. 8-5 at 1–6.) In addition, the subsequent internal investigation and the termination review panel both determined that Plaintiff's post violated DCSO's social media policy. (Doc. 8-6 at 1; Doc. 8-7; *see also* Doc. 8-3 at 2.) Plaintiff's post is, therefore, the sort of speech that "could undermine 'loyalty, discipline, [and] good working relationships among the [Department's] employees' if left unaddressed." *Duke*, 997 F. Supp. 2d at 1302 (alterations in original) (quoting *Busby*, 931 F.2d at 775). Furthermore, DCSO received two phone calls from members of the public complaining about the post. (Doc. 8-5 at 5.) Defendant cites these phone calls as evidence of a diminishment of public trust. (Doc. 16 at 4.) And, Plaintiff's Facebook profile—which was visible at least to his own Facebook friends—noted that he "works at Dougherty County Sheriff's Office." (Doc. 11 at 29.) In light of these facts, Defendant had a "compelling and legitimate government interest" in maintaining the public's confidence in DCSO's services

---

[5]    Plaintiff objects to the consideration of various unsworn (and sometimes unsigned) statements on summary judgment because they are not affidavits. (Doc. 14-3 at 9–10; *see also* Doc. 8-5.) Defendant counters that these statements were written by DCSO officers reporting Plaintiff's post to their superiors and that they played a role in Defendant's termination decision. (Doc. 16 at 5; *see also* Doc. 8-6 at 1.) The Court may consider these statements and refers Plaintiff to Fed. R. Civ. P. 56(c)(1)(A), which provides that parties making factual assertions at the summary judgment stage may cite to "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or *other materials* . . . ." (emphasis added). The Rule clearly provides for far more than affidavits. Additionally, to the extent Plaintiff is contending that these statements are inadmissible hearsay, the Court refers him to *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)), which notes that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." For purposes of this Motion, the Court considers these statements to assess the alleged disruption of Plaintiff's post rather than its content, for which the post itself is the best evidence.

and upholding a "favorable reputation with the public." *See Snipes v. Volusia Cty.*, 704 F. App'x 848, 853 (11th Cir. 2017) (per curiam) (citing *Anderson*, 239 F.3d at 1221–22); *see also Busby*, 931 F.2d at 774–75. Because of this evidence that Plaintiff's post caused disruption to DCSO's efficient operation, this factor weighs against Plaintiff.

Second, the Court considers the "manner, time, and place" of Plaintiff's speech. *Martinez*, 971 F.2d at 712. Plaintiff made the post while he was off-duty, at home, and using his personal cell phone. (Doc. 11 at 40–42, 51; Doc. 12-3 at 19.) These facts weigh in his favor. *See Duke*, 997 F. Supp. 2d at 1302. However, Plaintiff posted his speech to his Facebook page—a relatively public forum which identified him as a DCSO employee— rather than sending it as a private message to a limited number of people. The manner in which Plaintiff made his speech is also important. Plaintiff uses profanity throughout his post, heatedly censures "young white America," and concludes by anticipating a negative reaction: "And for those of you who may feel that this is some form of hate, "KMA.""[6, 7] (Doc. 8-4 at 2.) Even assuming that Plaintiff's comments "were intended to communicate something of value to the public discourse, there are many ways to communicate one's thoughts, and the vulgar, derogatory phrases used by [Plaintiff] weigh against him." *Snipes v. Volusia Cty.*, 704 F. App'x 848, 854 (11th Cir. 2017) (citing *Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994) (noting that the public employee's use of "vulgar, insulting, and defiant" language weighed against the employee under the *Pickering* balancing test)). Thus, the manner, time, and place analysis weighs against Plaintiff.

Third, the Court looks to the context in which the speech was made. Plaintiff's post opens by referring to people "upset with the president for allowing refugees in our country" and was made in December 2015—a period during which racially-charged rhetoric and issues of race and law enforcement were prevalent in the national conversation. The Court

---

[6] In his deposition, Plaintiff attempted to explain "KMA" as meaning "keep killing my ancestors," rather than the more profane meaning typically associated with that term. (Doc. 11 at 58.) Even taking as true Plaintiff's testimony about his subjective intentions, the Court must look to "the perceived character of the speech" rather than "the subjective intentions that accompany its delivery." *Morris v. Crow*, 117 F.3d 449, 458 n.3 (11th Cir. 1997). The Court does not believe that most readers of that term would have intuited Plaintiff's intended meaning.

[7] There is no per se rule that employee speech containing profanity fails the *Pickering* test. The speech must be assessed in light of all of the *Pickering* factors. *Morris*, 117 F.3d 458 n.4 (11th Cir. 1997).

fully appreciates that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citations and internal quotation marks omitted). At the same time, it cannot ignore the electrified atmosphere surrounding Plaintiff's speech. His public posting—as a self-identified law enforcement officer—of a profanity-laced commentary on racial injustice in the midst of an intensely-charged presidential election was sure to draw controversy to DCSO, and in fact it did. Because the context analysis calls for special protection of speech like Plaintiff's, and because the actual context also lends itself to being a source of controversy and disruption, this factor neither weighs for or against Plaintiff.

On balance, the Court finds that Defendant's interests in efficient public service outweighed Plaintiff's interest in commenting—in the way that he did—on public affairs. Regardless of whether termination was Defendant's only option, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52. Plaintiff has failed to carry his burden on the second prong of the *Pickering* test and, so, has failed to prove that his speech was constitutionally protected. Accordingly, Plaintiff's First Amendment claim fails as a matter of law.

## III. Equal Protection Claims

Plaintiff's Complaint also alleges that Defendant's termination of him for his Facebook post violated his rights under the Equal Protection Clause of the Fourteenth Amendment. (Doc. 3-1 ¶¶ 12, 17.) Specifically, Plaintiff alleges that white DCSO deputies who made racially-charged or inappropriate Facebook posts were not punished as severely as he was. (*Id.* ¶ 13.) He further alleges that Defendant "had no credible explanation" for his failure to discipline or terminate these deputies. (Doc. 14-3 at 11.)

"The Equal Protection Clause ensures a right to be free from intentional discrimination based upon race," including employment discrimination. *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1268 (11th Cir. 2003) (citations omitted). "[A] plaintiff must show a purpose or intent to discriminate in proving an equal protection violation based on racial discrimination." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 n.8 (11th Cir.

1991). A plaintiff can show intentional discrimination through several ways, including by satisfying the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lewis v. City of Union City*, 2019 WL 1285058, at *3 (11th Cir. Mar. 21, 2019) (en banc). "A plaintiff can also present direct evidence of discriminatory intent or demonstrate a convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at *3 (internal quotation marks omitted) (citing *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 921–22 (11th Cir. 2018) and *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Here, Plaintiff offers only circumstantial evidence of discriminatory intent and does not rely on a mosaic theory. Thus, the Court conducts only a *McDonnell Douglas* analysis.

To make out a *prima facie* case of racial discrimination under *McDonnell Douglas*, a plaintiff must show that (1) he belongs to a protected class, (2) he was qualified to do the job, (3) he was subjected to an adverse employment action, and (4) his employer treated similarly situated employees outside his class more favorably. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Once the plaintiff establishes a *prima facie* case, "the employer must articulate one or more legitimate, nondiscriminatory reasons for its actions." *Peterson v. Bd. of Trustees of the Univ. of Ala.*, 644 F. App'x 951, 955 (11th Cir. 2016) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)). At that point, the burden shifts back to the plaintiff, "who must offer evidence that the employer's reasons are pretexts for illegal discrimination" by showing "both that the employer's stated reason for the employment decision was false and that discrimination was the real reason." *Id.* (citing *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (per curiam)).

Here, Plaintiff has established a *prima facie* case of discrimination. There is no dispute that he meets the first three requirements of establishing a *prima facie* case because (1) he is African-American, (2) he was qualified to be a deputy sheriff, and (3) his employment was terminated. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (noting that termination is an adverse employment action) (citation and internal quotation marks omitted). Only the fourth requirement is disputed by the Parties.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has established that similarly-situated employees outside his protected class were treated more favorably than he was. "[A] plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Lewis*, 2019 WL 1285058, at *9 (quoting *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1355 (2015)). The comparison turns "not on formal labels, but rather on substantive likenesses." *Id.* Plaintiff has established that he and his proffered comparators were "similarly situated in all material respects"—that is, that he and they "engaged in the same basic conduct (or misconduct);" were "subject to the same employment policy, guideline, or rule;" and shared similar employment or disciplinary histories. *Id.* at **2, 9.

Plaintiff offers two comparators—white DCSO deputies Mark Farley and Michael Kerce. Plaintiff alleges that these two deputies "engaged in far more egregious and unprofessional Facebook posts"—including those that were "racist" or "misogynistic"— "than Plaintiff's one time expression of his political beliefs."[8] (Doc. 14-3 at 11.) Specifically, he points to a series of images containing vulgar, sexist, and racially-charged jokes that appeared on Farley and Kerce's Facebook pages, as well as to an image of a Confederate flag that appeared on Deputy Farley's page. (Doc. 12-7.) Defendant did not discipline Farley and Kerce for their posts. Deputy Kerce testified that he was asked to remove the image "out of respect" to DCSO because it had offended some of his fellow officers. (Doc. 12-6 at 13, 23–24.) He did not receive a formal reprimand, however, and was only "asked to pay more attention to what [he] allowed to go across [his] page" and to what he posted. (*Id.* at 37.) Deputy Farley testified that, for his posting of the Confederate flag and possibly other images, he was not counseled about violating DCSO's social media policy and that he was simply asked to "write a statement." (Doc. 12-8 at 23–25, 28–29, 46–47.)

Plaintiff, Kerce, and Farley all engaged in "the same basic conduct" when they posted political, controversial messages to Facebook. *See Lewis*, 2019 WL 1285058, at *9. Farley admitted that some people are offended by the Confederate flag, and Kerce admitted that his

---

[8]      There is some dispute as to whether or how some of the offensive posts came to be on Farley's and Kerce's Facebook pages. As such, there is a genuine issue of material fact with regard to some of the posts. Both Farley and Kerce admit to posting or liking at least one racial post, like Plaintiff. (*See* Doc. 12-6 at 21; Doc. 12-8 at 23.)

Facebook posting of a Confederate flag actually had offended people. (Doc. 12-6 at 13, 23–24; Doc. 12-8 at 15–16.) DCSO, in questioning Kerce and Farley about their postings, also recognized the potential offensiveness of the Confederate flag. While Kerce and Farley state that they do not recall any of the images alleged to have appeared on their pages, they did recall posting images of the flag. In essence, all three used social media to make statements that had the potential to be and were received as offensive based on race by members of the public whom they served as deputies. That Plaintiff's post contained curse words does not change the fact that the conduct—sharing messages which could be received as racially offensive on social media—was basically the same.

Moreover, as DCSO employees, all three of them were subject to DCSO's social media policy. (*See* Doc. 8-3 at 2; *see also, e.g.*, Doc. 12-3 at 25–27, 34–36, 51–52.) The record reveals no evidence that Kerce and Farley had significantly different employment or disciplinary histories from Plaintiff, either. What is clear is that Plaintiff's disciplinary history played no role in his termination, as Defendant has conceded that the post was the only reason for Plaintiff's discharge. (Doc. 12-3 at 15–16, 18–19.) Thus, Plaintiff has established a *prima facie* case of discrimination, and the burden shifts to Defendant to proffer a legitimate non-discriminatory reason for Plaintiff's termination. Defendant fails to do so.

Defendant argues only that Plaintiff, Farley, and Kerce were not similarly situated; but Defendant does not clearly state what his proffered, legitimate, non-discriminatory reason for firing Plaintiff is. Rather, Defendant argues in his Reply that the similarly-situated analysis is also the legitimate, non-discriminatory rationale. (*See* Doc. 16 at 7–8.) In discussing whether the three deputies were similarly situated, Defendant argues that "[w]hile Plaintiff's post created disruption in the service performed by the Sheriff's Office, Mr. Farley's and Mr. Kerce's Facebook posts did not." (*Id.*) In particular, he states that DCSO management learned of Plaintiff's post through the complaints of some of its officers and some outside complaints. (Doc. 8-1 at 10.) By contrast, management only learned of Farley's and Kerce's alleged posts through Plaintiff's attorney and had no reason to believe that anyone other than Plaintiff's attorney took offense to them. (*See id.*) Not only is this rationale belied by Defendant's action of asking Farley to remove one of his posts, it is also

undermined by Kerce's admission that at least one of his posts had offended people.[9] (Doc. 12-6 at 13, 23–24.)

Furthermore, to the extent that this is Defendant's proffered reason for firing Plaintiff, it falls into the realm of a "legitimate, *discriminatory* reason" for Defendant's actions, which does not operate to satisfy Defendant's burden. *See Dysart v. Palms of Pasadena Hosp., LP*, 89 F. Supp. 3d 1311, 1319 (M.D. Fla. 2015) (emphasis added). Further indicating the discriminatory basis for Defendant's action is his argument that Kerce and Farley had "a legitimate and appropriate reason for the posting." (Doc. 8-1 at 11.) In particular, he explains that Farley posted the picture because "he had ancestors who fought for both sides in the Civil War" and that "he likes the picture because it represents both sides of his family." (*Id.*) "In contrast, Plaintiff ranted on Facebook, expressing over-generalized opinions that people find racially insensitive, and exhibited unprofessional conduct unbecoming an officer of the law." (*Id.*) This argument clearly establishes Defendant's underlying position that there is a valid basis for the racially offensive posts made by the white officers but that there is no valid basis for the racially offensive posts made by the black officer.

As such, Defendant has failed to offer a legitimate, non-discriminatory reason for his action. Even if Defendant had proffered such a reason, his arguments outlined above support Plaintiff's assertion that the proffered reason is mere pretext. Accordingly, Defendant is not entitled to a judgment as a matter of law on Plaintiff's Equal Protection claim.

## IV.    State Law Claims

Plaintiff also seeks relief under the Georgia State Constitution, under Art. I, § 1, ¶ 5 (guaranteeing freedom of speech) and Art. I, § 1, ¶ 2 (guaranteeing equal protection under the law).[10] (Doc. 3-1 at 4.) In response, Defendant asserts state sovereign immunity—to the extent that these claims are against him in his official capacity—and official immunity—to the extent the claims are against him in his individual capacity.

---

[9]    It is unclear when Defendant became aware that Kerce's post had been deemed offensive by others, but it is telling that, even with this knowledge, Defendant did not discipline Kerce, let alone fire him.

[10]    Because it is not clear from Plaintiff's Complaint whether he seeks both injunctive relief and damages for his state claims and because it makes no difference to the final outcome, the Court presumes that he seeks both types of remedies.

### A. Official Capacity

As discussed above, in Georgia, "the constitutional doctrine of sovereign immunity forbids [state] courts to entertain a lawsuit against the State without its consent." *Lathrop*, 801 S.E.2d at 869. This immunity extends to "suits against the State, its departments and agencies, and its officers in their official capacities," including sheriffs and counties. *Id.*; *Carter*, 821 F.3d at 1323 (citations omitted). And it bars claims for both monetary damages and injunctive relief. *Lathrop*, 801 S.E.2d. at 891–92.

"The burden of demonstrating a waiver of sovereign immunity falls on the party seeking to benefit from it." *Carter*, 821 F.3d at 1324. Plaintiff's only arguments against any form of immunity (sovereign, official, or qualified) involve his federal claims. (Doc. 14-3 at 13–16.) He has failed to show that sovereign immunity has been waived for Defendant as to his state claims, and the Court already has found no evidence of waiver. Thus, sovereign immunity bars Plaintiff's state law claims against Defendant in his official capacity.

### B. Individual Capacity

#### 1. Damages Claims

Under Georgia law, the doctrine of official immunity shields public officers sued in their individual capacities "for discretionary actions taken within the scope of their official authority, and done without willfulness, malice, or corruption." *Everson v. Dekalb Cty. Sch. Dist.*, 811 S.E.2d 9, 12 (Ga. Ct. App. 2018). Official immunity prevents a plaintiff from recovering for damages unless he establishes that "the official negligently performed a ministerial act or performed a discretionary act with malice or an intent to injure." *Glass v. Gates*, 716 S.E.2d 611, 621 (Ga. Ct. App. 2011), *aff'd*, 729 S.E.2d 361 (Ga. 2012); *see also* Ga. Const. Art. I, § 2, ¶ IX(d).

"A discretionary act . . . calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Stone v. Taylor*, 506 S.E.2d 161, 163 (Ga. Ct. App. 1998). Plaintiff does not challenge Defendant's claim that he was acting in his discretionary authority as Sheriff of Dougherty County when he terminated Plaintiff's employment as a deputy. Moreover, Defendant testified that he had final decision-making authority over

Plaintiff's termination and that he reviewed Plaintiff's post. The record reflects that Defendant also reviewed the findings of the termination hearing panel before making his decision. (Doc. 12-3 at 14, 64; Doc. 8-7.) Thus, Defendant was performing a discretionary act when he terminated Plaintiff's employment. *See also* Ga. Code Ann. § 15-16-23 (stating that sheriffs have discretion to appoint deputies); *Emp. Ret. Sys. v. Lewis*, 136 S.E.2d 518, 521 (Ga. Ct. App. 1964) (holding that sheriffs alone are entitled to appoint or discharge their employees).

The next question, therefore, is whether Defendant acted with malice or an intent to injure. "In the context of official immunity, 'actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact.'" *Peterson v. Baker*, 504 F.3d 1331, 1339 (11th Cir. 2007) (quoting *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999)). "Actual malice requires more than harboring bad feelings about another." *Adams*, 520 S.E.2d at 898. "[R]ather, ill will must be combined with the intent to do something wrongful or illegal." *Id.* Implied malice—that is, "the reckless disregard for the rights or safety of others"—does not rise to the level of actual malice. *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007). As for actual intent to cause injury, that standard requires "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999) (citation and internal quotation marks omitted).

Plaintiff's Complaint cursorily alleges that Defendant evinced "willful misconduct, malice, fraud, wantonness, oppression, and entire want of care," but he does not elaborate on that assertion, and there are not sufficient facts in the record to support such a claim. (Doc. 3-1 at 5.) The Court's finding that Plaintiff made a *prima facie* claim of an equal protection violation does not imply actual malice or the intent to cause injury. Accordingly, official immunity bars Plaintiff's state law damages claims against Defendant in his individual capacity.

### 2.  Injunctive Relief Claims

As for Plaintiff's possible injunctive relief claim, "the doctrine of official immunity does not bar suits for declaratory or injunctive relief brought against county officers in their individual capacities," so long as the relief sought is prospective. *Love v. Fulton Cty. Bd. of Tax*

*Assessors*, 821 S.E.2d 575, 585 (Ga. Ct. App. 2018). However, "a court should grant an injunction only in clear and urgent cases and only if there is no other remedy available." *Lewis v. City of Atlanta*, 553 S.E.2d 611, 612 (Ga. 2001) (citing Ga. Code Ann. § 9-5-8 and *Besser v. Rule*, 510 S.E.2d 530 (Ga. 1999)). In *Lewis*, former government employees filed a state action for wrongful termination while their § 1983 actions were pending in federal court. *Id.* The Georgia Supreme Court held that injunctive relief in the form of reinstatement was not warranted because "the pendency of the federal lawsuits and the availability of reinstatement or monetary damages by the federal court . . . [was] evidence that other remedies exist." *Id.* The pendency of Plaintiff's § 1983 equal protection claims in this Court and the availability of reinstatement is evidence that other remedies exist. Therefore, state law injunctive relief is not warranted.

## V.   Claims for Punitive Damages and Attorney's Fees and Costs

Finally, Plaintiff's Complaint alleges that he is entitled to punitive damages against Defendant under Ga. Code Ann. § 51-12-5.1. (Doc. 3-1 at 4.) That section authorizes punitive damages in tort actions upon a showing, "by clear and convincing evidence," of "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Ga. Code Ann. § 51-12-5.1. The Court cannot say, as a matter of law, that Plaintiff could not establish at trial that Defendant acted in this manner. Accordingly, summary judgment is not appropriate on Plaintiff's claim for punitive damages.

Plaintiff's Complaint also seeks as remedy attorney's fees and costs pursuant to 42 U.S.C. § 1988. (Doc. 3-1 at 4.) The Court cannot yet say who will be the "prevailing party" at trial in this case. As such, summary judgment is also not appropriate on this claim.

## CONCLUSION

For the reasons above, Defendant's Motion for Summary Judgment (Doc. 8) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED** as to Plaintiff's:

- federal damages claims against Defendant in his official capacity;
- First Amendment injunctive relief claim against Defendant in his official capacity;

- First Amendment damages and injunctive relief claims against Defendant in his individual capacity; and
- state law claims.

The Motion is **DENIED** as to Plaintiff's:

- Equal Protection injunctive relief claim against Defendant in his official capacity; and
- Equal Protection damages and injunctive relief claims against Defendant in his individual capacity.

Plaintiff's Cross Motion for Summary Judgment and for a Permanent Injunction Restoring Him to His Position (Doc. 14) is **DISMISSED** as untimely.

**SO ORDERED**, this 29th day of March, 2019.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, JUDGE**
**UNITED STATES DISTRICT COURT**